2012 OK 89

The BANK OF BEAVER CITY,
Plaintiff/Appellee,

v.

BARRETTS' LIVESTOCK, INC.,
Defendant/Appellant.

Tri–State Feeders, Inc., Defendant/Third–
Party Plaintiff,

v.

Jon Dane Morris, Third–Party Defendant.

No. 109,190.

Supreme Court of Oklahoma.

Oct. 30, 2012.

Douglas L. Jackson, Julia C. Rieman, Enid, Oklahoma, for Defendant/Appellant.

Michael C. Bigheart, W. Blake Hulse, Enid, Oklahoma, for Plaintiff/Appellee.

KAUGER, J.:

¶ 1 The dispositive issue presented is whether the good faith requirement of 12A O.S.2011 § 2–403 extends to third parties—in this case an unpaid seller of cattle—and requires that the third party be notified of a debtor's financial condition.[1] We hold that it does not.

¶ 2 Bank alleges that on August 9, 2004, it perfected a security interest in all of Lucky Moon's livestock, including all after-acquired livestock, giving it a superior claim to cattle purchased by Lucky Moon from Barretts to satisfy the debt owed by Lucky Moon to Bank of approximately $2,000,000 as of May 20, 2010. Barretts asserts that Bank does not have priority over it because Bank was not a good faith secured creditor. The trial court granted Bank's motion for summary judgment, finding that Bank's perfected security interest had preference over Barretts' unperfected security interest.

¶ 3 Barretts appealed, contending that Bank did not have a superior security interest because: 1) Bank's security interest never attached; and 2) Bank had not acted in good faith. The Court of Civil appeals affirmed the judgment of the trial court. Bank seeks certiorari, contending that: 1) the case presents an issue of first impression as to when good faith under 12A O.S.2011 § 2–403 should be determined; 2) Bank's security interest never attached; and 3) the Court of Civil Appeals' decision was inconsistent with a different decision of the Court of Civil Appeals on which the court relied. We granted certiorari on February 21, 2012, to address the novel issue of whether the good faith requirement of 12A O.S.2011 § 2–403 extends to third parties and requires that they be notified of a debtor's financial condition.

## FACTS

¶ 4 Barretts had been selling cattle to Lucky Moon for several years. Typically, it would deliver the cattle, submit an invoice, and then give Lucky Moon a few weeks to pay. Barretts did not file a financing statement or perfect any security interest in the cattle. Between August 28, 2009, and December 11, 2009, Barretts made sales and deliveries totaling 903 head of cattle to Lucky Moon. Lucky Moon made two separate payments towards the total amount, one by wire transfer from Bank on October 13, 2009, and one by check paid by Bank on October 29, 2010. The remaining balance after payment was $214,533.52, representing 393 head of cattle. At this point, Lucky Moon wrote four separate checks totaling $176,234 in partial payment of the remaining debt which were dishonored by Bank for insufficient funds. Both Bank and Barretts claimed an interest in the cattle. On or about January 13, 2010, the parties agreed to auction the cattle and deposit the payments into escrow pending a determination of which claim was superior.

¶ 5 Bank filed a petition seeking declaratory relief arguing that it possessed priority over the sale proceeds based in its perfected

---

1. Title 12A O.S.2011 § 2–403 is Oklahoma's codified provision of U.C.C. § 2–403 (to which it is identical). It states:

(1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though
(a) the transferor was deceived as to the identity of the purchaser, or
(b) the delivery was in exchange for a check which is later dishonored, or
(c) it was agreed that the transaction was to be a "cash sale", or

(d) the delivery was procured through fraud punishable as larcenous under the criminal law.
(2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.
(3) "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.
(4) The rights of other purchasers of goods and of lien creditors are governed by the articles on Secured Transactions (Article 9) and Documents of Title (Article 7).

security interest. Barretts, which had no perfected security interest, asserted that the Bank's conduct deprived it of a superior security interest because it had not acted in good faith by continuing to cover Lucky Moon's overdrafts despite knowledge of its deteriorating financial condition; and that one of the co-owners lied about the cattle transactions. Barretts also argued that it would not have delivered the cattle had it known that Bank was not going to honor Lucky Moon's checks.

## THE GOOD FAITH OBLIGATION OF 12A O.S.2011 § 2–403 DOES NOT EXTEND TO THIRD PARTIES

### A. Bank of Beaver City's Security Interest

¶ 6 The Uniform Commercial Code, 12A O.S. 2011 § 1–9–322(a)(2), provides that a perfected security interest or agricultural lien has priority over a conflicting unperfected security interest or agricultural lien.[2] A perfected security interest in after-acquired property takes precedence over an unperfected security interest. We must determine whether the Bank perfected a security inter-

2. Title 12A O.S.2011 § 1–9–322(a) provides:

(a) Except as otherwise provided in this section, priority among conflicting security interests and agricultural liens in the same collateral is determined according to the following rules:
(1) Conflicting perfected security interests and agricultural liens rank according to priority in time of filing or perfection. Priority dates from the earlier of the time a filing covering the collateral is first made or the security interest or agricultural lien is first perfected, if there is no period thereafter when there is neither filing nor perfection;
(2) A perfected security interest or agricultural lien has priority over a conflicting unperfected security interest or agricultural lien; and
(3) The first security interest or agricultural lien to attach or become effective has priority if conflicting security interests and agricultural liens are unperfected.

3. Title 12A O.S.2011 § 1–9–308(a) provides:

(a) Except as otherwise provided in this section and Section 1–9–309 of this title, a security interest is perfected if it has attached and all of the applicable requirements for perfection in Sections 1–9–310 through 1–9–316 of this title have been satisfied. A security interest is perfected when it attaches if the applicable requirements are satisfied before the security interest attaches.

est in 2004, which applied to all of the livestock including all after-acquired cattle.

¶ 7 Barretts does not dispute the creation of Bank's security interest in all of Lucky Moon's after acquired cattle, but it asserts that Bank's security interest was never perfected because Bank was not a good faith purchaser for value and therefore could not acquire rights to the collateral sufficient to permit attachment. Pursuant to 12A O.S.2011 § 1–9–308, a security interest is perfected if it has attached and all the applicable requirements for perfection in Sections 1–9–310 through 1–9–316 of Title 12A have been satisfied.[3] Barrett's contends that Bank's security interest was never perfected pursuant to 12A O.S.2011 § 1–9–308 because it never attached. Pursuant to 12A § 1–9–203, a security interest attaches to collateral when it becomes enforceable against the debtor with respect to that collateral.[4] A security interest becomes enforceable against the debtor and third parties only if: 1) value has been given; 2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and 3) certain formalities regarding the security agreement are satisfied.[5]

4. Title 12A O.S.2011 § 1–9–203(a) provides:

(a) A security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral, unless an agreement expressly postpones the time of attachment.

5. Title 12A O.S.2011 § 1–9–203(b) provides:

(b) Except as otherwise provided in subsections (c) through (i) of this section, a security interest is enforceable against the debtor and third parties with respect to the collateral only if:
(1) value has been given;
(2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and
(3) one of the following conditions is met:
(A) the debtor has authenticated a security agreement that provides a description of the collateral and, if the security interest covers timber to be cut, a description of the land concerned;
(B) the collateral is not a certificated security and is in the possession of the secured party under Section 1–9–313 of this title pursuant to the debtor's security agreement;
(C) the collateral is a certificated security in registered form and the security certificate has been delivered to the secured party under Section 8–301 of this title pursuant to the debtor's security agreement; or

¶ 8 Barretts argues that even if Lucky Moon had possession of the cattle it did not pay for them. Therefore, it could not transfer rights to the cattle pursuant to 12A O.S. 2011 § 1–9–203(b)(2), making perfection of Bank's security interest in the cattle impossible. This situation is anticipated by the language of 12A O.S.2011 § 2–403(1), which provides that a person with voidable title has the power to transfer good title to a good faith purchaser for value even if the delivery was in exchange for a check which was later dishonored.[6] Barretts delivered 393 cows to Lucky Moon and Lucky Moon paid for those cattle with checks which were later dishonored. Under these facts, Lucky Moon had voidable title, allowing the bank's security interest to attach if the bank were a good faith purchaser for value.[7]

¶ 9 Pursuant to 12A O.S.2011 § 2–403(1), for a security interest to attach to after-acquired property, the purchaser must have acquired its interest as a good faith purchaser for value to have priority over an unpaid seller. The bank is a purchaser, because it possesses a security interest.[8] Whether the Bank acted in good faith as a purchaser hinges on the definition of good faith and whether the good faith requirement extends to a third party such as Barretts. Good faith is defined in Title 12A O.S. § 1–201(20) as honesty in fact and the observance of reasonable commercial standards of fair dealing.[9]

### B. Duty of Good Faith

¶ 10 Barretts asserts that the Bank became intimately involved in Lucky Moon's operations and spoke with Lucky Moon at least weekly about its deteriorating financial condition.[10] The duty of good faith exists between the lender and debtor, and one court has found a lender not to be a good faith purchaser due to its conduct, regardless of whether that duty is extended to third parties. In *Monsanto Co. v. Heller*, 114 Ill. App.3d 1078, 70 Ill.Dec. 646, 449 N.E.2d 993 (1983), Heller had a deep relationship with its debtor, Ilikon, and exercised considerable control over its business practices.[11] Heller continued to cover Ilikon's checks to Monsanto Co. despite detailed knowledge of Ilikon's insolvency.[12] However, Barretts does not al-

---

(D) the collateral is deposit accounts, electronic chattel paper, investment property, letter-of-credit rights, or electronic documents, and the secured party has control under Section 7–106, 1–9–104, 1–9–105, 1–9–106, or 1–9–107 of this title pursuant to the debtor's security agreement.

6. Title 12A O.S.2011 § 2–403(1) provides:
(1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction to purchase the purchaser has such power even though
(a) the transferor was deceived as to the identity of the purchaser, or
(b) the delivery was in exchange for a check which is later dishonored, or
(c) it was agreed that the transaction was to be a "cash sale", or
(d) the delivery was procured through fraud punishable as larcenous under the criminal law.

7. Title 12A O.S.2011 § 2–403; *Wolfe v. Faulkner*, 1981 OK 48, ¶ 21, 628 P.2d 700. See *In Re Matter of Samuels & Co.*, 526 F.2d 1238, 1242–44 (5th Cir.1976); *Maryott v. Oconto Cattle Co.*, 259 Neb. 41, 607 N.W.2d 820, 827 (2000) (Nebraska has adopted UCC Section 2–403 as well).

8. Title 12A O.S.2011 § 1–201(29) and (30) define "purchaser" and "purchase" as

(29) 'Purchase' **means taking by sale,** discount, negotiation, mortgage, pledge, lien, **security interest,** issue or reissue, gift, or any other voluntary transaction creating an interest in property.
(30) 'Purchaser' means a person who takes by purchase. (Emphasis added.)

9. Good faith is an overriding purpose of the code. See Grant Gilmore, *The Good Faith Purchase Idea and the Uniform Commercial Code: Confessions of a Repentant Draftsman*, 15 Georgia L.Rev. 605, 629 (1981).

10. Appellant's Petition for Writ of Certiorari, 2.

11. *Monsanto Co. v. Heller*, 114 Ill.App.3d 1078, 70 Ill.Dec. 646, 449 N.E.2d 993, 994–95 (1983).

12. *Monsanto Co.*, note 11, 70 Ill.Dec. 646, 449 N.E.2d at 998–99, supra. The court held:

While we agree that a secured lender is not expected to extend unlimited credit for an indefinite period in the absence of an express agreement, "good faith" under the Code has been held expressly to require that parties engage in "reasonable commercial standards of fair dealing."
. . . .

lege that Bank exercised the kind of detailed control over Lucky Moon's business for its own profit that the court in *Monsanto Co.* found to be in bad faith.[13]

¶ 11 Here, the dispositive issue is whether Bank owed any duty to Barretts, a third party. The Court of Appeals held that it knew of no controlling authority to support the proposition that the Bank owed a duty of good-faith under 12A O.S.2011 § 2–403 to Barretts, a third party. We agree. Although this is a case of first impression in Oklahoma, our holding is consistent with the Court of Civil Appeals and the case law of other states interpreting the application of their versions of U.C.C. § 2–403 to disputes between unpaid sellers and lenders with a perfected security interest in a debtor's inventory.

¶ 12 A decision of the Fifth Circuit Court of Appeals, *Shell Oil Co. v. Mills Oil Co., Inc.*, 717 F.2d 208 (5th Cir.1983), is on point. In a diversity action interpreting Mississippi's version of U.C.C. § 2–403, the court held that:

> 1) knowledge of the existence of an unpaid seller does not impair a lender's good faith; and

> Given the course of dealing between the parties, [Lender's] direct involvement with the operation of Ilikon and with Ilikon's transactions with its suppliers, we believe ... the trial court correctly concluded that Heller was not entitled to the priority of a "good faith purchaser for value" under section 2–403(1).

**13.** The relationship in *Monsanto Co.* involved daily telephone conversations about:

> Ilikon's sales of the prior day; the amount collected in Heller's lockbox and the prior day's balances in Ilikon's accounts at the Bank; the amount of checks previously written by Ilikon that had not yet cleared the Bank and the amount of cash required to cover checks previously written that were to clear the Bank that day, as well as general business information concerning Ilikon and Monsanto.... Heller monitored its loans to Ilikon by auditing Ilikon's books and records and examining its and facilities from time to time. Heller also required regular written financial reports from Ilikon including daily reports of bank balances, sales collections and accounts receivable, raw materials and monthly inventory reports.

*Monsanto Co.*, note 11, 70 Ill.Dec. 646, 449 N.E.2d at 995, supra.

> 2) no agreement, express or implied, obligated the lender to disclose its debtor's financial condition to an unpaid seller.[14]

¶ 13 Other cases do not state the second proposition directly. They do, however, bolster the argument that knowledge of outstanding third-party claims which have not been paid does not prevent a lien creditor from being a good faith purchaser within the meaning of U.C.C. § 2–403. For example, in *Matter of Samuels & Co., Inc.*, 526 F.2d 1238, 1243–44 (5th Cir.1976), the court held that lack of knowledge of outstanding claims was necessary to acquire status as a bona fide purchaser under the common law and was required in many U.C.C. provisions, but the Code's definition of an Article Two good faith purchaser did not expressly or impliedly include lack of knowledge of third-party claims as an element.[15]

¶ 14 The court in *Maryott v. Oconto Cattle Co.*, 259 Neb. 41, 607 N.W.2d 820, 828 (2000), another case concerning rights to cattle, agreed with that analysis, holding that a lender's duty of good faith did not require that the lender be ignorant of third party claims. In *Maryott*, the lender did not notify

**14.** *Shell Oil Co. v. Mills Oil Co., Inc.*, 717 F.2d 208, 213–14 (5th Cir.1983). The Court held:

> Shell argues only that Citizens Bank's knowledge that Shell was unpaid creates a genuine issue as to the bank's good faith. We reject Shell's argument....

*Shell Oil Co.*, 717 F.2d at 214. The Court, in discussing Mills' claim that the bank had a duty to protect him against the consequences flowing from his contingent liability as a guarantor of Shell Oil Company, also held that:

> [m]ills contends that the bank officers should have notified Mills that Mills Oil Company's overdrafts were being honored. *Mills' contentions are meritless.* No precedent is cited which establishes any such duties. No agreement, express or implied, obligated the bank to notify or advise Mills regarding the financial affairs of Mill Oil Company. [Emphasis supplied.]

*Shell Oil Co.*, 717 F.2d at 214. At this point the court was not interpreting claims related to good faith and U.C.C. § 2–403, but since the court found no duty to notify Mills, period, it is implied that none existed under U.C.C. § 2–403 either.

**15.** *In Re Matter of Samuels & Co., Inc.*, note 7, 526 F.2d at 1243–44, supra.

any other parties of its actions before cancelling the cattle company's line of credit, and like this case, prevented payment for the cattle by dishonoring drafts.[16] In *Cooperative Finance Ass'n v. B & J Cattle Co.*, 937 P.2d 915 (Colo.App.1997), the court determined that a secured party may prevail over an unpaid seller even when the secured party terminates advances on a line of credit without notice and then dishonors drafts drawn in reliance on that line of credit.[17]

¶ 15 Good faith does not require a lender go out of its way to finance a troubled debtor purely for the benefit of affected third parties. The Code's good faith provision requires honesty in fact, but it does not require a secured party to continue financing a doomed business enterprise.[18] These cases collectively imply that under similar circumstances and facts, the secured party lender will prevail despite knowledge of its debtor's negative financial condition and the competing claims of third parties. As long as the decision concerning the funding was commercially reasonable, the secured creditor with a floating lien remains a good faith purchaser

even if it terminates funding with the knowledge that sums are owed to third parties.[19]

## CONCLUSION

¶ 16 Summary judgment comes to this court as a de novo review when it involves only legal questions.[20] Inferences and conclusions are to be drawn from the underlying facts contained in the record and are to be considered most favorably to the party opposing summary judgment.[21] Granting a motion for summary judgment is only proper when one party is entitled to judgment as a matter of law because there are no material disputed factual questions.[22] The underlying facts are not in dispute in this appeal.

¶ 17 Under the facts, pursuant to 12A O.S. 2011 § 2–403, Bank is a secured party which qualifies as a good faith purchaser for value. It is entitled to priority over an unpaid credit seller.[23] The good faith requirement does not extend to unpaid sellers such as Barretts. The Bank did not violate such a duty by deciding to terminate its funding of Lucky Moon, and to dishonor its checks without notifying Barretts of Lucky Moon's shaky financial situation.

16. *Maryott*, note 7, supra.

17. *Cooperative Finance Ass'n v. B & J Cattle Co.*, 937 P.2d 915, 921 (Colo.App.1997), citing *In Re Matter of Samuels*, note 7, supra. The court held:

> [a] secured creditor with an after-acquired property clause is frequently a line-of-credit lending institution which can, and sometimes does, elect without notice to terminate advances on the line of credit and then dishonors drafts issued in reliance on the line of credit. In that instance, the secured creditor may well enhance its secured position at the expense of the unpaid cash-seller. Even under these circumstances, however, the secured party prevails.

18. *In Re Matter of Samuels & Co., Inc.*, note 7, 526 F.2d at 1243, supra.

19. *In Re Matter of Samuels & Co., Inc.*, note 7, 526 F.2d at 1244, supra.

20. *Welch v. Crow*, 2009 OK 20, ¶ 9, 206 P.3d 599, 602–603; *EOG Res. Mktg., Inc. v. Oklahoma State Bd. of Equalization*, 2008 OK 95, ¶ 13, 196 P.3d 511, 518–19; *Carmichael v. Beller*, 1996 OK 48, ¶ 2, 914 P.2d 1051, 1053.

21. *K & K Food Services, Inc. v. S & H, Inc.* 2000 OK 31, ¶ 16, 3 P.3d 705, 711; *Vance v. Federal Nat. Mortg. Ass'n*, 1999 OK 73, ¶ 6, 988 P.2d 1275, 1276; *Shelley v. Kiwash Elec. Co-op., Inc.*, 1996 OK 44, ¶ 15, 914 P.2d 669, 674.

22. *Jennings v. Badgett*, 2010 OK 7, ¶ 4, 230 P.3d 861, 864; *Lowery v. Echostar Satellite Corp.*, 2007 OK 38, ¶ 11, 160 P.3d 959, 963–64; *Vance v. Federal Nat. Mortg. Ass'n*, 1999 OK 73, ¶ 6, 988 P.2d 1275, 1276.

23. It is worth noting that Colorado has amended its version of U.C.C. § 2–403 to specifically exclude its application to cattle that have not been paid for. Colo. Rev. Stat § 4–2–403 states in pertinent part:

> (1.5) Notwithstanding any other provision of this section, when livestock have been delivered under a transaction of purchase and on the accompanying brand inspection certificate or memorandum of brand inspection certificate the seller has conspicuously noted that payment of the consideration for the transaction has not been received, the buyer does not have power to transfer good title to a good faith purchaser for value until payment is made.

CERTIORARI PREVIOUSLY GRANTED; COURT OF CIVIL APPEALS OPINION VACATED; TRIAL COURT AFFIRMED.

TAYLOR, C.J., KAUGER, WINCHESTER, EDMONDSON and COMBS, JJ., concur.

COLBERT, V.C.J., WATT, REIF and GURICH, JJ., dissent.

COMBS, J., with whom TAYLOR, C.J., and KAUGER, J., join concurring:

¶ 1 I concur in the majority opinion but write to express my concern as to Barretts' ability to protect its interest prior to the attachment of the lien. Barretts argue without being paid for the cattle, even though possession has transferred to Lucky Moon, title could not have been transferred and therefore the lien could not attach. An additional issue presented would be how Barretts could as the seller protect its interest after physical transfer of the livestock but prior to payment for the sale of the cattle. I note with interest the majority's identification of the legislative amendment to the Uniform Commercial Code made by the Colorado legislature as reflected in footnote 23.

¶ 2 Specifically, Colorado has amended its version of UCC § 2–403 seemingly to address the very issue presented in the facts of this case. The Colorado lawmakers provided:

"Notwithstanding any other provision of this section, when livestock have been delivered under a transaction of purchase and on the accompanying brand inspection certificate or memorandum of brand inspection certificate the seller has conspicuously noted that payment of the consideration for the transaction has not been received, the buyer does not have power to transfer good title to a good faith purchaser for value **until payment is made.**" Emphasis applied.

See, Colo. Rev. Stat § 4–2–403.

¶ 3 Under such a provision Barretts as seller of the cattle would have been able to protect its interest until such time as payment had been made by Lucky Moon. In

commercial transactions such as these where the parties have rolling inventory and thus rolling collateral, in order to protect the free market enterprise the seller must be assured that title does not pass nor does the ability to attach a lien interest under 12A O.S.2011 § 2–403 accrue until payment has been made. To do otherwise exposes the seller to the risk of stop payment orders and insufficient remedies to be compensated for the transaction.

WATT, J., with whom COLBERT, V.C.J. and REIF, J. join, dissenting.:

¶ 1 The majority correctly parrots the Uniform Commercial Code's statements on security interests and their priorities. Thereafter, with two sentences at the end of the opinion, reaches a result that invades the province of the fact finder about what duty is owed to the livestock company. The issue, as framed, is whether the Bank owed any duty to a third party. The opinion goes on to hold that, under these "contested facts," it does not. Admittedly, this is the general rule under the Uniform Commercial Code. Because I would return this cause to the trier of fact for resolution, I dissent.

¶ 2 The majority sets forth the Code's definition of "good faith" dealing as "honesty in fact and the observance of reasonable commercial standards of fair dealing."[1] It does not provide the added input found in the Uniform Commercial Comments to the same section where the definition of good faith is found. It provides in pertinent part:

[T]he definition of 'good faith' in this section requires **not only honesty in fact but also 'observance of reasonable commercial standards of fair dealing.'** Although 'fair dealing' is a broad term that must be defined in context, **it is clear that it is concerned with the fairness of conduct rather than the care with which an act is performed**. . . . [Emphasis provided.]

Oklahoma Comments to the 2001 version of the same section providing that " 'good faith' was honesty in fact in the conduct or transac-

---

1. Title 12A O.S.2011 § 1–201(19).

tion concerned"[2] are even more instructive. They provide in pertinent part:

> ... (19) 25 Okl.St.Ann § 9 provides: "Good faith consists in an honest intention to abstain from taking unconscientious advantage of another, even through the forms or technicalities of law, together with an absence of all information or belief of facts which would render the transaction unconscientious." The term was also used, but not defined, in the Negotiable Instruments Law [48 Okl.St.Ann. §§ 122(3), 126 now repealed.] **The Commercial Code definition is briefer, but the spirit of the two definitions are the same.** [Emphasis provided.]

¶ 3 Most certainly, under either of the two definitions of "good faith," supra, there are material issues of fact which remain unresolved. Here, even the uncontested facts leave a reasonable person to ponder whether: the secured creditor (the Bank), is in bed with the debtor (2nd party), through knowledge of their poor financial condition and that they are selling cattle out of trust. With this knowledge, they honor numerous overdraft checks written to the livestock company (3rd party). Once the Bank realizes that the debtor really is "going belly up" and still has in its possession some 300 plus cattle does it dishonor checks to the livestock company in an attempt to increase its own collateral and financial position.

¶ 4 If the Bank did act in the way described, they owe a duty to the 3rd party. Under these facts, most certainly, reasonable people could conclude that the Bank "hid behind the log" to improve its position and abandoned its duty of good faith in the commercial setting. We cannot assume, as does the majority, that the facts are as either party presents them. The livestock company should have the opportunity to prove that the Bank abandoned its position of priority by acting in bad faith.

¶ 5 I cannot concur in an opinion which makes assumptions resulting in the reward of devious behavior by the Bank while ignoring the rights of the innocent 3rd party. Admittedly, the livestock company was sloppy in not filing a financing statement. Nevertheless, I would prefer to reward the careless rather than the devious. Therefore, I dissent.

GURICH, J., with whom COLBERT, V.C.J. and REIF, J. join dissenting:

¶ 1 The majority holds that the good faith requirement of 12A O.S.2011 § 2–403 does not extend to third parties. Such a holding is not supported by the Uniform Commercial Code,[1] and case law interpreting the Code,[2]

---

**2.** Title 12A O.S.2001 § 1–201(19).

**1.** Section 2–403 states that "[a] person with voidable title has power to transfer a good title to a good faith purchaser for value." 12A O.S.2011 2–403(1). Third parties are not precluded under § 2–403 from asserting that the purchaser lost its priority because it did not act in good faith. "Good faith is an overriding purpose of the Code." *Monsanto v. Walter E. Heller Company, Inc.,* 114 Ill.App.3d 1078, 70 Ill.Dec. 646, 449 N.E.2d 993, 1000 (1983).

**2.** *Manheim Auto. Fin. Servs., Inc. v. Guthrie,* No. 06–2298–KHV, 2007 WL 3054184, at *9 (D.Kan. Oct. 19, 2007) (finding that Manheim presented no evidence regarding reasonable commercial standards of fair dealing or whether it followed those standards and had not established as a matter of law that it acted in good faith so as to qualify as a good faith purchaser for value under § 2–403); *Chrysler Credit Corp. v. Ferguson Pontiac–GMC, Inc.,* 1993 OK CIV APP 43, ¶¶ 11–12, 853 P.2d 1282, 1284 (holding that for Chrysler's security interest to defeat Ferguson's reclamation right, Chrysler had to be a good faith purchaser for value but that evidence of Chrysler's good faith was either conflicting or absent and so summary judgment was inappropriate); *Iola State Bank v. Bolan,* 235 Kan. 175, 679 P.2d 720, 731–32 (1984) (holding that the bank failed to act in good faith and so it was not a good faith purchaser and its security interest did not attach against the sellers); *Monsanto,* 70 Ill.Dec. 646, 449 N.E.2d at 1000 (holding that the course of dealings between the parties and Heller's direct involvement with the operation of Ilikon's transactions with its suppliers precluded Heller from claiming priority as a good faith purchaser for value because Heller did not act in good faith); *In re American Food Purveyors, Inc.,* 1974 WL 21665, 17 U.C.C. Rep. Ser. 436 (N.D.Ga.1974) (finding that the secured party had to act in good faith and have no notice of the debtor's insolvency condition to prevail over the reclaiming rights of the seller).

The cases relied on by the majority do not hold that the good faith requirement of § 2–403 does not extend to third parties. Rather, these cases find that either no evidence of bad faith was presented or the evidence presented did not rise

and goes too far—it bars all future third parties from defeating a secured lender's interest under § 2–403 regardless of how egregiously the lender has acted.

¶ 2 To be a good faith purchaser for value, a party must act honestly in fact and observe reasonable commercial standards of fair dealing.[3] Barretts' Livestock submitted evidence that created an issue of material fact as to whether the bank acted in good faith.[4] As such, summary judgment should not have been granted.

to the level of bad faith. *See Maryott v. Oconto Cattle Co.,* 259 Neb. 41, 607 N.W.2d 820, 828 (2000) (finding that Maryott had not specifically alleged bad faith in either of its petitions and had not met its burden of proving bad faith on the part of Farm Credit); *Cooperative Finance Ass'n, Inc. v. B & J Cattle Co.,* 937 P.2d 915, 921 (Colo.App.1997) (finding that the lender's terminating advances on a line of credit and dishonoring drafts issued in reliance on the line of credit was not bad faith so as to defeat the lender's priority); *Shell Oil Co. v. Mills Oil Co., Inc.,* 717 F.2d 208, 213 (5th Cir.1983) (rejecting Shell's argument that the bank's knowledge that Shell was unpaid was enough to create a material issue as to the bank's good faith); *Matter of Samuels & Co., Inc.,* 526 F.2d 1238, 1243 (5th Cir.1976) (finding no evidence that the lender acted in bad faith).

3.  12A O.S.2011 § 1–201(20).

4.  Defendant's Response to Plaintiff's Motion for Summary Judgment at 28–37.